**UNITED STATES of America, Plaintiff,**

v.

**CITY OF ASBURY PARK, a municipal corporation, et al., Defendants.**

**Civ. A. No. 84–72.**

United States District Court, D. New Jersey.

Feb. 17, 1972.

Herbert J. Stern, U. S. Atty., by Jonathan L. Goldstein, First Asst. U. S. Atty., Richard W. Hill, Z. Lance Samay, Carl R. Woodward, III, Asst. U. S. Attys., for plaintiff.

James M. Coleman, Jr., Asbury Park, N. J., for defendant City of Asbury Park.

Seymour J. Kagan, for defendants Township of Long Beach and Long Beach Sewerage Authority.

Lum, Biunno & Tompkins, by George J. Koelzer, Newark, N. J., C. Stephen Barrett, III, for defendants Borough of Avon-by-the-Sea and others.

## OPINION AND ORDER

BARLOW, District Judge.

Plaintiff, the United States of America, brings this action for a preliminary and permanent injunction to restrain the discharge of sewage sludge by sixteen of the named defendants herein.[1] The Government contends that the practice of discharging sludge into the Atlantic Ocean is in violation of 33 U.S.C. § 407. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1345.

All defendants operate primary sewage treatment plants in Monmouth and Ocean Counties, New Jersey. The defendants receive raw sewage and separate it into two components—sludge, which consists of the solids which settle out of the sewage, and liquid effluent. Both the effluent and the sludge are pumped into the Atlantic Ocean through outfall pipes. The point of entry into the ocean is approximately 1000 feet eastward from the beach.

The effluent is chlorinated and customarily pumped into the ocean continuously throughout the year. The sludge, which is composed of water, organic matter and inorganic matter, in varying percentages, is retained in holding tanks during the year and is pumped into the ocean during the three-month period between December 15th and March 15th.[2] The pumping process is facilitated by diluting the sludge with liquid effluent and/or water. This essentially two-step process of municipal waste disposal has been practiced on the New Jersey coast for nearly forty years.

When this suit was instituted, on January 14th, 1972, the defendants had not yet pumped the sludge contained in their holding tanks into the Atlantic Ocean. On that date, this Court issued a temporary restraining order preventing the defendants from pumping sludge into

---

1. The complaint against the defendant Township of Long Beach was dismissed.

2. The Department of Environmental Protection of the State of New Jersey permits the defendants to discharge sludge only between those dates. However, special permission to discharge sewage sludge at other times may be given "only after careful review of all factors involved" upon request, in writing, to that Department. See Exhibit D–19.

the ocean for ten days. On January 21st, 1972, the restraint was continued for an additional ten-day period. On February 3rd, 1972, the restraint was continued until further order of the Court.[3]

During December, 1971, and January, 1972, representatives of the Government studied the sludge discharge procedures employed by the Borough of Belmar, which is not a party here. Samplings of Belmar's retained sludge were taken and the effect of its sludge and effluent discharge into the Atlantic Ocean was observed. Belmar's procedures were described as being representative of the defendants herein in that its system was essentially the same primary sewage treatment, septic tank facility employed by the defendants.[4]

## FACTS AS TO THE APPLICABILITY OF THE ACT

The defendants' primary sewage treatment plants fall into three categories:

A. SEPTIC TANK (See Exhibit G–37)

Bradley Beach, Avon, Neptune City, Neptune Township, Spring Lake Plant No. 2, Spring Lake Heights, Sea Girt, Manasquan, Point Pleasant Beach and Lavalette all have septic tank systems. A septic tank is basically a rectangular tank with a sloping bottom. As raw sewage enters the tank, those suspended solids with a specific gravity greater than water are pulled by gravity to the bottom of the tank. The suspended solids are both separated from raw sewage and permitted to de-

compose in the same tank. Decomposition of these removed solids (sludge) is known as anaerobic digestion; that is, the oxidation of organic material, with gases as the by-product.[5] As gasification takes place, the specific gravity of the sludge changes and some of the sludge will rise to the surface and form a "scum blanket" on the top of the tank. The scum blanket will be made up of hair particles and fibrous materials, as well as some of the organic materials. Thus, there are two layers of sludge build-up, residue at the bottom and the scum balanket on the top, that must be removed.

High pressure hoses, using city water, are customarily used to break up sludge so that it can be pumped. Sludge is generally pumped by positive displacement pumps, rather than by centrifugal pumps which are used for sewage, because sludge is heavier than sewage. It takes approximately five days to break up and pump all the accumulated sludge into the ocean.

B. IMHOFF TANK (See Exhibit G–38)

Seaside Park has an Imhoff tank and Seaside Heights has a more modern version of it, known as a Clari-Gestor. The Imhoff tank is divided into two compartments. Raw sewage is admitted into the upper chamber, or settling compartment, and gravity pulls the solid particles to the bottom. Rather than the solids remaining in the tank, as in the septic tank, they pass through the hopper bottom into the lower compartment. Anaerobic

---

3. Because of the protracted nature of the evidentiary hearing, it was not possible to adhere to the twenty-day limitation for temporary restraining orders which is permitted by Fed.R.Civ.P 65(b). The Court did not, however, regard the extension beyond twenty days as being a "substantial extension" in light of the proscription contained in Sims v. Greene, 160 F.2d 513 (3d Cir., 1947).

4. Belmar lies between the defendants Avon-by-the-Sea and Spring Lake. Belmar's

outfall pipe lies approximately 700 feet from the shore, rather than 1000 feet from the shore as in the case of the defendants herein.

5. The process of decomposition, or digestion, reduces the removed solids to about 50% of its original content. The remaining solids are not easily degraded biologically; that is, further chemical breakdown is very slow.

digestion of sludge occurs in this lower compartment, and as gasification takes place a scum blanket will form.

## C. PRIMARY CLARIFIER (See Exhibit G–39)

Raw sewage enters the tank and solids, as in the other systems, fall to the bottom by the force of gravity. As the solids settle, rather than building up, they are continuously dragged by a moving chain mechanism to one end of the tank. The accumulated sludge is then pumped to digesters or other sludge treatment facilities. Asbury Park, Spring Lake Plant No. 1, Bay Head and Long Beach Township all use the primary clarifier, and the physical differences among the plants are slight. Anaerobic digestion occurs in these digesters or holding tanks.

Samples of sludge were taken by representatives of the Environmental Protection Agency (EPA) from the defendants' plants. The physical descriptions of sludge varied, depending, in large measure, on which plant was being described. In terms of color, most witnesses described sludge in varying shades of brown, black and gray. The physical consistency was also described as varying from "bone dry" to "99% water". For example, when the EPA took a sludge sample from a sludge pump at Seaside Heights, they found it too watery to transfer into a plastic bag. When, however, a sample was taken from the outfall line at Belmar, the spigot became clogged and a wire had to be inserted to clear the line. Other witnesses testified to the sludge's clogging funnels and pipettes; to its inability to pass through screens of varying dimensions; to its clogging of pumps, and to its clogging of the EPA's water-sampling boat's cooling system strainers to the point of causing that boat's system to fail.

Sludge, generally, is composed of human excretion, household waste from food preparation, laundry waste, commercial waste, dirt, etc. Items such as corn kernels, tomato seeds and prophylactics, sanitary napkins, pieces of orange peel, sand, shaving brushes, toothbrushes, plastic diaper liners, plastic toys and filter-tip cigarettes are some of the items frequently found in primary sludge. Further, sludge is not homogeneous; that is, unless it is mixed, the lighter materials will rise to the surface, with the heavier particles falling to the bottom.

Experts for all parties defined and characterized sludge in a number of ways: a thin suspension of solids; a slurry of solids in a water vehicle— "slurry" being defined as a mixture of insoluble material in water (gasoline was offered as an example of a pure liquid or fluid); sludge is a plastic solid because it has rigidity and shearing force; sludge is a fluid because it will flow where a shearing force is applied— "shearing force" being defined as a force applied tangentially; sludge is definitely a liquid if its solids content is less than 15%; sludge is a liquid because it flows; sludge is a liquor—that is, it contains two states, a solid state and a liquid state.

Total solids tests were performed by the EPA on sludge samples taken from sewage treatment plants of the defendants and others. The results of these tests (along with findings as to the concentration of certain metals in sludge) are found in Government Exhibits G–42 and G–43.[6] Most of the plants tested showed total solids concentrations of between 6% and 20%; that is, a range of 60,000 to 200,000 solid parts per million.

If sludge has a solids content of 14% or more it cannot be pumped without being diluted, as noted heretofore. The defendants add water and effluent to dilute their sludge. In Point Pleasant Beach, water and effluent is added to sludge at the rate of 10 to 1; in Sea Girt the dilution is 18 to 1; in Bay

6. The chemist tested for metals by weight rather than by volume because, in his judgment, sludge more closely resembled a solid.

Head the dilution is 13 to 1, exclusive of the water needed to break up the sludge crust; in Long Beach Township the dilution is between 6 and 8 to 1. If these dilutions are used in conjunction with the EPA's figures for the total solids found in these municipalities' sludge tanks, the total solids to be found in diluted sludge as it passes into the ocean can be reasonably estimated. These results are found in Government Exhibit G–53, and are summarized below:

| MUNICIPALITY | TOTAL SOLIDS IN SLUDGE | | TOTAL SOLIDS OF DILUTED SLUDGE IN STORAGE TANK | | TOTAL SOLIDS OF DILUTED SLUDGE AND EFFLUENT MIXTURE | |
|---|---|---|---|---|---|---|
| | % BY WEIGHT | ppm | DILUTION RATIO [7] | ppm | DILUTION RATIO | ppm |
| POINT PLEASANT BEACH | 18 | 180,000 | | | 10:1 | 18,000 |
| SEA GIRT | 9 | 90,000 | 9:1 | 10,000 | 18:1 | 5,000 |
| BAY HEAD | 7 | 70,000 | 3:1 | 23,300 | 13:1 | 5,400 |
| SEASIDE HGTS. | 1 | 10,000 | | | | |
| ASBURY PARK | 1 | 10,000 | | | 0:1 | 10,000 |
| LONG BEACH TWP. | 19 | 190,000 | 4:1 | 47,500 | 7:1 | 27,100 |

The above data indicate that the lowest concentration of solids in sludge pumped by the illustrative defendants into the ocean is 5,000 parts per million.

Raw sewage, by definition, is the water supply of a community after it has been fouled by various uses. From the standpoint of source, it is a combination of the liquid or water-carried wastes from residences and business and industry, together with ground water, surface water and storm water. It also is composed of suspended solids and dissolved solids, including human fecal material. Primary sewage treatment, such as employed by the municipalities herein, only removes the suspended solids. Suspended solids are visible and make up about 50% of the total solids, which are defined as that material which is retained on a .045 micron filter. The dissolved solids must be removed by secondary sewage treatment.

Raw sewage, sludge and sea water can also be defined in terms of solid parts per million. The experts uniformly define normal raw sewage as 200 parts per million, or .02% solids. Put another way, it consists of 99.98% water. It was clear, however, from the testimony, that the solids concentration in sewage can vary markedly, depending on the amount of rainfall and other water which enters the sewers. "Strong" raw sewage can contain as much as 1000 solid parts per million, or, as stated in another fashion, it consists of 99.9% water.

Theoretically, sludge can be diluted to the point where it has the same or even a lesser solids concentration (by weight) than raw sewage. This does not ensure, however, that the individual solid particles can be reduced to the size in which they are found in raw sewage.

Drinking water normally contains no more than two or three solid parts per million. The United States Public Health Service allows up to 500 solid parts per million in soft drinking water, and in some sections of the Southwest drinking water can exceed 2,500 solid parts per million.

The total solids in sea water is at least 1.79%, or 17,900 parts per million. Most sea water, however, has between 30,000 and 35,000 solid parts per million,

7. Dilution ratio represents the amount of water added to sludge so that it can be pumped.

but the concentration of suspended solids may be only 10 parts per million.

At the time Belmar discharged its sludge into the Atlantic Ocean, the Government, as we have noted, by prearrangement, observed that process and the Environmental Protection Agency (EPA) made video tapes both of the sludge and effluent discharge during the months of December, 1971, and January, 1972. The tapes disclosed that when the treatment plant was pumping a "boil" was observed at the end of the outfall line. Further, the "plume" of the discharge would move in various directions, depending on current and wind conditions. Dye was added to the effluent discharge in order to trace the plume's movement. When sludge was pumped in addition to the normal discharge of effluent, dye was not used. Observers testified that the sludge plume was visible for 1 to 1½ miles from the point of discharge. The discharge was described as being "dark brown" and observers noted surface scum up to ½ mile from the point of discharge. The scum was described as consisting of small white particles, and there was also observed high turbidity in the water outside of the discharge bubble. Observers on the EPA water-sampling vessel also saw large amounts of suspended solids and surface solids at the point of the outfall during the time that sludge was being pumped. These same persons also noticed that sea gulls swooped down when sludge was being pumped, but not when effluent alone was discharged. Scum was not observed when effluent alone was pumped.

## CONCLUSIONS OF LAW AS TO THE APPLICABILITY OF THE ACT

The Government contends that the practice of sludge-dumping in the Atlantic Ocean by the defendants herein is in violation of § 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407 (hereinafter sometimes referred to as the "Refuse Act" or "Act"). The Government further seeks injunctive relief to prevent future discharges of sludge into the Atlantic Ocean.

The Act provides, in part, as follows:

"It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: * * * "

The defendants contend, first, that the Rivers and Harbors Appropriation Act is applicable only to rivers and harbors and not to the Atlantic Ocean, or, put another way, that the Atlantic Ocean is not navigable water within the intendment of the Act. Secondly, the defendants urge that the sludge currently being discharged into the Atlantic Ocean by the defendants falls within the exception set forth in the Act in that it is a by-product of sewage and, when discharged into the ocean is flowing in a liquid state. Lastly, the defendants insist that the Government has not established—as they are required to do—that to continue the discharge of sludge would occasion immediate and irreparable harm, and that the Government is, accordingly, not entitled to the injunctive relief it seeks.

The defendants' initial argument that the Atlantic Ocean is not a navigable water of the United States within the purview of the Rivers and

Harbors Appropriation Act of 1899 is without merit. It has long been established that the authority of the United States to regulate its navigable waters is derived from the Constitution. U.S.Const., art. I, § 8, subsec. 3 (the Commerce Clause), and U.S.Const. art. III, § 2, subsec. 1 (the Admiralty Clause); United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S. Ct. 291, 85 L.Ed. 243 (1941); Economy Light and Power Company v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L. Ed. 847 (1921); Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914 (1900); Egan v. Hart, 165 U.S. 188, 17 S.Ct. 300, 41 L.Ed. 680 (1897); United States v. Rodgers, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071 (1911); The Montello, 20 Wall. 430, 87 U.S. 430, 22 L.Ed. 391 (1874); The Daniel Ball, 10 Wall. 557, 77 U.S. 557, 19 L.Ed. 999 (1871); Imbrovek v. Hamburg-American Steam Packet Co., 190 F. 229 (D.C.Md.1911); United States v. Banister Realty Co., 155 F. 583 (E.D.N.Y., 1907).

■ There can be no question that the Atlantic Ocean is a navigable water of the United States within the meaning of the Rivers and Harbors Appropriation Act of 1899. The authority of the United States to regulate its navigable waters, including the Atlantic Ocean, is clearly implicit under any test defining the navigable waters of the United States as those capable of supporting commerce or those to which the admiralty jurisdiction of the United States extends. Clearly, it would seem any statute which attempts to regulate the navigable waters of the United States must—unless limited in some specific fashion—include all of the waters of the United States. No such limiting words appear in § 13 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 407).[8]

■ While it has occasionally been argued that the principal legislative purpose of the Refuse Act was the protection of navigation—and that argument is made tangentially here—it is clear that the scope of the Act is not limited merely to the protection of navigability upon United States waters, but has been interpreted to prohibit pollution of those waters, and is in no sense limited to those forms of pollution which may be said to impede or affect navigation.

In United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966), the Supreme Court, after an examination of the history of the Act, concluded: "It is plain from its legislative history that the 'serious injury' to our watercourses * * * sought to be remedied was caused in part by obstacles which impeded navigation *and in part by pollution.*" 384 U.S., at 228–229, 86 S.Ct., at 1429. (Emphasis supplied.) See, also, United States v. Standard Oil Co., supra; United States v. Esso Standard Oil Co. of Puerto Rico, 375 F.2d 621, 623 (3d Cir., 1967). See United States v. Ballard Oil Co. of Hartford, 195 F.2d 369, 371 (2d Cir., 1952); La Merced, 84 F.2d 444, 446 (9th Cir., 1936); United States v. Maplewood Poultry Co., 327 F.Supp. 686, 688 (D. Me., 1971); United States of America v. U. S. Steel Corporation, 328 F.Supp. 354 (N.D.Ind., 1970).[9]

■ It is clear, then, that the Government may not be precluded from maintaining this action for lack of stat-

---

8. United States v. Esso Standard Oil Co. of Puerto Rico, 375 F.2d 621 (3d Cir., 1967), involved the prosecution of the defendant under § 13 of the Rivers and Harbors Act, 33 U.S.C. § 407. Although the argument advanced by the defendants here apparently was not made there, the facts of that case disclose that the defendants were convicted of a violation of the statute for permitting liquid petroleum products to flow directly into the coastal waters surrounding Puerto Rico.

9. The Court in United States v. Ballard Oil Co. of Hartford, supra, held that 33 U.S.C. § 407 established two separate, though related, offenses, and that the statutory language "whereby navigation shall or may be impeded or obstructed" qualifies only the offenses set forth in the second clause of the statute and has no application to a violation of the first clause, to which the present action is addressed. See, also, United States of America v. U. S. Steel Corporation, supra.

utory authority unless the discharge of sludge, in the circumstances here, falls within the exception expressed in the statute, removing from the reach of the statute refuse " \* \* \* flowing from streets and sewers and passing therefrom in a liquid state \* \* \*."

In United States v. Standard Oil Co., supra, Justice Douglas undertook to review the legislative history of § 13 of the Rivers and Harbors Act, and he concluded that that section codified certain pre-existing statutes,[10] including the 1894 Act (28 Stat. 363), which prohibited, in substance, depositing in harbors and rivers for which Congress had appropriated money for improvements, "ballast, refuse, dirt, ashes, cinders, mud, sand, dredgings, *sludge*, acid, or any other matter of any kind other than that flowing from streets, sewers, and passing therefrom in a liquid state". (Emphasis supplied.) Justice Douglas further concluded that " \* \* \* the use of the term 'refuse' in the codification serves in the place of the lengthy list of enumerated substances found in the earlier Acts \* \* \*. The legislative history demonstrates that Congress intended to codify, without substantive change, the earlier Acts". Accordingly, the term "refuse", as currently employed in § 13, includes sludge, and sludge, of course, is not limited to the by-product of a sewage disposal system, but applies equally to other industrial and commercial proce-

dures which separate particulate matter from water.[11]

In United States v. Republic Steel Corporation, supra, which involved an attempt by the Government to enjoin several steel companies from discharging industrial wastes into the Calumet River under §§ 10 and 13 of the Refuse Act, Justice Douglas, analyzing the nature of the exception, observed that:

" \* \* \* The materials carried here are 'industrial solids,' as the District Court found. The particles creating the present obstruction were in suspension, not in solution. Articles in suspension, such as organic matter in sewage, may undergo chemical change. Others settle out. All matter in suspension is not saved by the exception clause in § 13. *Refuse flowing from 'sewers' in a 'liquid state' means to us 'sewage.'* . . . The fact that discharges from streets and sewers may contain some articles in suspension that settle out and potentially impair navigability is no reason for us to enlarge the group to include these industrial discharges." (362 U.S., at 490–491, 80 S.Ct. at 889.) (Emphasis supplied.)

The central question here, then, is, simply stated: Is "sludge" sewage or, being a by-product of or derived from sewage, is it to be considered as being within the exception contained in the Act?[12] It is our view that sludge is not

---

10. An 1886 Act (24 Stat. 329) ; an 1888 Act (25 Stat. 209) ; an 1890 Act (26 Stat. 453).

11. In 1899, sludge, as a by-product of sewage treatment, was probably not unknown, although the term at that time must have been designed to include "sludge" from other industrial and commercial procedures, for in United States v. Republic Steel Corporation, 362 U.S. 482 at p. 506, n. 27, 80 S.Ct. 884 at p. 898, 4 L.Ed. 2d 903, Justice Harlan, in his dissent, noted that: "In 1900, only 4% of the urban population having sewage facilities provided any treatment at all for domestic and trade wastes. *Modern Sewage Disposal* (1938, p. 13), Fed. of Sewage Works Assns. ; Langdon Pearse, Editor, Anniversary Book, Lanc. Press., Inc.)"

12. Any attempt to extend the definition of sewage to include sludge would also appear to run afoul of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq. (Supp. V, 1970). This recent expression of Congress contains a Congressional Declaration of National Environmental Policy designed to "encourage productive and enjoyable harmony between man and his environment ; to promote efforts which will prevent or eliminate danger to the environment and biosphere and stimulate the health and welfare of man ; [and] to enrich the understanding of the ecological systems and natural resources important to the nation . . ."

More importantly, in § 4332 of NEPA Congress "authorizes and directs that to the fullest extent possible : (1) the poli-

sewage or its equivalent and is not, therefore, within the exception of the Act.

▇ It is apparent from the evidence produced here that in terms of the relative solid-liquid ratio of sludge, the proportion varies markedly among the defendant's sewage plants, as well as within the individual plants themselves. In some instances the samples taken from the retaining tanks were described as "bone dry" and in other cases as being almost entirely water. In general, however, the Court is satisfied that sludge, being the accumulated and thereby concentrated residue of raw sewage, is much more viscous and varies substantially and demonstrably from the consistency of raw sewage. Raw sewage consists, as we have seen, of approximately 99.98% water. It is clear that sludge cannot meet this definition, even after it is diluted for pumping by water or by the addition of liquid effluent, as the data compiled in Exhibit G–58 reveals. While sludge is in the retaining tanks of the various defendants' sewage systems, it must be regarded more as a solid than a liquid, even though it can be found in both states. Adding water or liquid effluent in order that it be diluted sufficiently to pump it to sea does not reconstitute it as raw sewage. Moreover, in support of the Government's claim that sludge was more solid or heavier or more viscous than sewage, the witnesses generally agreed that positive displacement pumps were required to pump sludge because it is heavier than sewage, and not centrifugal pumps, which are customarily used for the pumping of sewage. In short, sludge is essentially a solid when compared to raw sewage, and is not made any less so when water or liquid effluent is added to it in order that it may be diluted sufficiently to be pumped into the sea.

Further, the Court is satisfied that the circumstantial evidence indicates that while the consistency of sludge may vary amongst the plants of the various defendants—and, indeed, in the plants themselves—the characteristics of sludge in all of the defendants' plants are essentially the same. Sludge, then, is not sewage and is not, by composition, its equivalent. Accordingly, sludge is not "refuse * * * flowing from streets and sewers and passing therefrom in a liquid state * * *", within the exception contained in the Act.

## FACTS AND CONCLUSIONS OF LAW AS TO INJUNCTIVE RELIEF

The EPA, during December, 1971, and January, 1972, collected a series of sludge samples both from the defendants' retaining tanks and from the sea water at the time of the sludge discharge procedures at Belmar.

Tests of these samples were made to determine the viral content thereof; the presence of heavy metals; the presence of bacteria, and the chemical oxygen demand of these samples.

### VIRAL CONTENT

Viruses were isolated in the liquid portion of some sea water samples, and in the sludge which was filtered-out. More viruses were found in the sludge than in the liquid. Types of paralytic polio virus were identified. Although the tests were capable of recovering only a very small percentage of the viruses which can occur in human feces, it was established that if one pathogen (disease-producing organism) is found,

---

cies, regulations, and *public laws of the United States shall be interpreted* and administered in accordance with the policies set forth in this chapter . . . ". (Emphasis supplied.)

While it is true that this general Congressional policy cannot be regarded as abrogating the statutory exception, however ancient, contained in § 13 of the

Refuse Act, it is nonetheless clear that the language of NEPA requires that any attempt to expand the scope of the exception be strictly and narrowly confined, and that the exception should not be construed to accommodate or include the discharge of any other polluting material, save sewage, into the navigable waters of the United States.

there is a high scientific probability that many others are also present.

The viruses found were of the type which multiply in or near the gastrointestinal tract of man, and are excreted by infected people in their feces. The viruses are thus found in raw sewage, and in sludge. Viruses will not multiply outside a living host, and will gradually die-off if stored in a sewage treatment plant holding tank. Although the viral population will decrease when stored, its virulence[13] can only be changed by passing the virus through another living host. Virulence is also affected by the phenomenon known as the "reversion factor"; that is, when polio vaccine is ingested for immunization purposes, some virus excreted in the recipient's feces will assume a more virulent form. In any event, the polio virus excreted cannot be less virulent than the virus found in vaccine.

These viruses can survive for many months in cold water.[14] The addition of effluent enables them to survive longer in the ocean.[15] If sludge was dumped now, it is probable that some viruses would survive into the summer months.

The testimony established that if a person took a large dose of virus, he would probably become sick, and he could infect his family.[16] All viruses are pathogenic; that is, they can cause disease or infection. The viruses found in sludge are capable of producing a wide range of disease; for example, poliomyelitis, aseptic meningitis, herpangina, pleurodyne, myocarditis, rash diseases, diarrheal diseases, and respiratory diseases. Hepatitis is transmitted by virus found in human feces, and enters the ocean through sewage and sludge. The virus becomes concentrated in the flesh of shellfish, and thus may enter the human food chain.

The testimony also established that the dumping of sludge is a health hazard, and the dumping of virus-containing material in any place where it might contact humans is dangerous and hazardous. Although the testimony was inconclusive as to whether sludge has caused or will cause harm to marine life and animals, it was asserted that, in general, the pollution of water with viruses results in the transmission of disease.

Virtually no destruction of viruses occurs in chlorinated sewage effluents with a residual chlorine level of 2 parts per million; 30 parts per million are necessary to destroy viruses. The sewage treatment plants tested by the EPA used residual chlorine levels of 2–3 parts per million.

## BACTERIAL CONTENT

The evidence discloses that sludge has a high organic content, and is a source of nutrients for bacteria and other microorganisms; that sludge will tend to accumulate and settle-out in water, thus providing an environment in which bacteria will multiply. The survival capability of fecal coliform bacteria in a permanent resident population, as found in ocean bottom sediments, is significantly greater than in the water. These bacteria may eventually be released to the surrounding waters. There is a high probability that some bacteria in ocean bottom sediments could exist for two months, although a few days after the sludge is dumped in the ocean the coliform count in[17] the water might be low. Daily effluent pumping tends to increase the survival of fecal coliform.

The EPA tested for total coliform bacteria, which are found in the feces of warm-blooded animals, and for fecal coliform, which is that portion of the total

---

13. Virulence is a measure of a virus' disease or infection capability.

14. In fact, viruses survive longer in a cold than in a warm environment.

15. Although salt water destroys viruses more quickly than fresh water.

16. Virulence tests were not performed on EPA samples.

17. The generally accepted measure of bacterial quality in water is the total coliform test.

coliform found only in the gut and feces of warm-blooded animals. The coliform count is use to determine the presence of pathogens. Referring to G–54 (bacteriological results of sludge taken from defendants' plants), the testimony revealed that the samples showed very high levels of fecal bacteria and a high level of disease-producing micro-organisms, especially since salmonella bacteria was isolated, it was concluded that these levels were much higher than usually found in recreational beach areas. The EPA also took sea water samples off Belmar in December, 1971, before Belmar discharged sludge, and in January, 1972, after the sludge had been pumped. These tests showed that in December, 1971, the bacterial content of the sea water was below the State standard and no salmonella was isolated; but in January, 1972, the fecal coliform count exceeded acceptable limits [18] and salmonella was found in sea water. Although the defendants offered ocean sampling tests taken June 28, 1971, November 17, 1971, and January 21, 1972, to prove that the total coliform and fecal coliform counts were within acceptable levels, it appeared, however, that for these tests to be accurate and more representative, sampling should have been done more frequently, as water quality varies from moment to moment. The testimony further established by a defense witness that the practice of discharging sludge and primary-treated effluent violates New Jersey's water quality standards. Moreover, the State of New Jersey directed the defendant-municipalities to phase-out the current plants, and in 1967 each of the defendants was directed to upgrade its plant, which has not yet been accomplished.

The evidence further revealed that fecal pollution is one of the worst types of water pollutants in terms of containing disease-producing bacteria; that is, salmonella, shigella, brucella, mycobacterium, and vibrio. Salmonella [19] produces gastroenteritis; shigella produces bacterial dysentery; vibrio produces cholera; mycobacterium produces tuberculosis; brucella produces brucellosis.

Twenty-five per cent (25%) of New Jersey's shellfish harvesting area is closed because it does not meet state-federal water quality standards; that is, the total coliform median cannot exceed 70 mpn in 100 milliliters, and no more than 10% of the samples can have a 230 mpn reading. It was further stated that shellfish from an area where there is a high total coliform count (greater than 70 mpn per 100 milliliters) pose a health threat if eaten.

The defendants introduced in evidence testimony relating to the "Havens and Emerson" report which was conducted at the request of the State of New Jersey to study water quality conditions off the coast, and which test was completed in 1965. Samplings taken in conjunction with this study revealed that as of 1967 sludge was not harmful to the environment. This study did not, however, include tests for viral content, heavy metals, total solids content, fecal coliform, or for chemical oxygen demand and I do not regard it as definitive thereby. Moreover, the reports and the testimony in connection with this report indicated that if bathers use ocean waters which are also used for waste disposal, such bathers must become reconciled to the remote possibility of infection.

---

18. The fecal coliform standard for Coastal Waters–1 [waters of the Atlantic Ocean up to roughly 1500 feet from shore] shall not exceed 50 mpn per 100 milliliters.

19. Salmonella, however, dies very quickly in salt water. In a few days, 90% will die, and only 10% will persist up to 30 days. Although the salmonella findings were negative in most instances, these results do not prove the absence of salmonella since the testing method is crude and its sensitivity is low. A positive reading, however, implies a high number of salmonella present. There is also a high scientific probability that if one pathogen is found, others are present.

## HEAVY METALS CONTENT

The EPA tests detected the presence of heavy metals in sludge samples and, further, the testimony indicated that diluting sludge has no effect on the toxicity of the heavy metals found therein; that is, the presence of 50 parts of mercury per billion of diluted sludge would inhibit and almost arrest algae growth, and would adversely affect photosynthesis. The deleterious effect on photosynthesis also harms marine life by reducing the amount of dissolved oxygen present in the ocean.

Copper was described as a notorious agent for destroying algae and inhibiting its growth—2 or 3 parts per million would be sufficient (See Exhibit G–42, heavy metals concentrations in defendants' sludge tanks). Copper also reacts with other metals in a phenomenon called "synergism", where the effect on a living organism is toxicity greater than either metal imparts alone.

The results disclosed by Exhibit G–61 indicated that the mercury, copper, lead, chromium and aluminum concentrations are in excess of between 40 to 2000 times the concentrations in which they are usually found in the ocean. This increase in heavy metals concentrations means greater toxicity, which can affect the growth of or even kill organisms living in the ocean. By reducing the number of organisms which are available as food for the next higher organism, the entire food web is affected.

## CHEMICAL OXYGEN DEMAND (COD) TESTS

The chemical oxygen demand, stated simply, is the oxygen need to satisfy the requirements of an organism. Sewage has a large COD; if sludge has 2000 times as many solid parts per million as sewage (20% sludge compared with normal raw sewage of 200 parts per million), it will have a COD 2000 times that of sewage.

The high COD of sludge reduces the amount of oxygen available for microorganisms, and thus reduces the number of microorganisms that can survive. This, in turn, makes survival for higher level organisms which feed on microorganisms (e. g., fish) more difficult. Carried to its extreme, this process reduces the quantity of marine life available for man's consumption. The testimony disclosed that if the sludge found in Exhibit G–42 were dumped into the ocean, the oxygen concentration in the water would be reduced, thus affecting the algal population and its ability to produce oxygen. In addition, the sludge would stimulate the growth of bacteria not normally present in high concentrations in marine systems, would contribute to the turbidity of the system, and would decrease the amount of sunlight available to all marine organisms.

## CONCLUSION

■ The basis of injunctive relief in the Federal Courts has historically been predicated upon a finding of irreparable harm and the inadequacy of legal remedies (Beacon Theaters v. Westover, 359 U.S. 500, 506, 79 S.Ct. 948, 3 L.Ed.2d 988 1959)).

■ The evidence presented here by the Government satisfies both of these tests. The discharge of sludge into the Atlantic Ocean, in the circumstances here, constitutes immediate and irreparable harm and produces a destructive impact upon marine life and upon the environment generally. More importantly, the sludge disposal practice of the defendants here presents a dangerous health hazard, that is both immediate and continuing, to those many thousands of human beings who utilize the coastal waters along the New Jersey beaches for year-round recreation.

Accordingly, it is ordered that the defendants herein be and hereby are permanently enjoined from discharging or depositing all sludge accumulations currently retained by them into the waters of the Atlantic Ocean, and are, further, permanently enjoined from all future deposits or discharges of sludge into the waters of the Atlantic Ocean.