COVE TANKERS CORP., Plaintiff,

v.

UNITED SHIP REPAIR, INC.,
**Defendant.**

No. 80 CIV 4196 (LBS).

United States District Court,
S. D. New York.

Sept. 10, 1981.

As Amended Oct. 15, 1981.

William M. Kimball, Heidell, Pittoni & Moran, P. C., New York City, for plaintiff.

William J. Burke, Thomas J. Stadnik, Poles, Tublin, Patestides & Stratakis, New York City, for defendant.

## OPINION

SAND, District Judge.

Defendant's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) presents a question of first impression, namely whether injury and death occurring on the Atlantic Ocean 135 miles off the coast of the United States, meet the situs requirement of section 3 of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 903(a) (hereinafter "LHWCA"), which limits coverage to "injury occurring upon the navigable waters of the United States." Defendant argues that the act covers such injury, and that consequently this complaint of a shipowner who has already paid settlements to an injured worker and the family of a deceased worker and now seeks indemnification from the workers' employer must fail as a matter of law, inasmuch as Congress in the 1972 amendments to the LHWCA abolished indemnification actions brought by the shipowner against an injured worker's employer, see 33 U.S.C. § 905(b). Plaintiff argues that the LHWCA does not cover such injury.

After many years of litigation and numerous judicial decisions devoted to locating the line demarking the landward reach of the LHWCA, plaintiff would have us now find a line three miles off the coast of the United States demarking the seaward reach of the act. Plaintiff would have us hold that these two injured workers, though covered by the LHWCA workmen's compensation system when the vessel they were repairing left port and ventured out into the Atlantic Ocean, ceased to be covered when the vessel crossed a line three miles offshore while deviating for testing purposes. We do not read the act this way, and decline to find such a line.

The essential facts are not in dispute. Plaintiff Cove Tankers Corp. (hereinafter "Cove") was at the time of the accident the owner of the United States flag vessel S/S Cove Communicator. The accident occurred aboard ship on or about April 9, 1977, while the ship was en route from Philadelphia to New York. At the time of the accident, the ship was making a deviation of 135 miles offshore [1] for purposes of testing.

The accident killed Nicos Georgopoulos and injured Christos Roussos. At the time of the accident, Georgopoulos and Roussos were functioning as ship repairers aboard the vessel and were employees of defendant United Ship Repair, Inc. (hereinafter "United").

---

[1] As to the exact location of the vessel at the time of the accident, defendant states that it "has no reason to doubt the assertion of plaintiff's counsel * [" * At the pretrial conference herein held 14 January 1981."] that the vessel was approximately 135 miles off the Atlantic coast of the United States when the accident occurred." Defendant's Memorandum at 2 (citations omitted). However, plaintiff in its Complaint at ¶ 5 has asserted that at the time of the accident the vessel was "on the high seas approximately 200 miles outside U. S. territorial waters." Whether the accident occurred 135, 200 or 203 (see pp. 105–106 infra regarding the width of United States territorial waters) miles offshore makes no difference in the issue presented by this motion or the outcome. In any case, the accident occurred on the high seas. See United States v. Louisiana, 394 U.S. 11, 22–23, 89 S.Ct. 773, 780–781, 22 L.Ed.2d 44 (1969). See also United States v. Hilton, 619 F.2d 127, 131 n.1 (1st Cir.) cert. denied, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980).

Subsequent to the filing of this Court's original opinion on September 11, 1981, counsel to the parties have advised the Court that a question has arisen whether testing was, in fact, the purpose of the deviation. For the reasons hereafter stated, it is immaterial why or how the vessel happened to be on the high seas when the casualty occurred.

Roussos commenced suit against the ship-owner, Cove, in the United States District Court for the Eastern District of Virginia to recover damages for his injury, and that claim, with medical and other expenses, was settled for $196,455.74.[2] The next of kin of Georgopoulos also made claims against Cove for his alleged wrongful death, *see* Complaint ¶ 7, and these, together with funeral and burial expenses, were settled for $72,190.58.

Cove then brought the current case against United for the amount of the two settlements, and for plaintiff's legal and other expenses amounting to over $25,000 allegedly incurred in defending the Roussos suit and obtaining the settlements.[3] Cove has alleged that the repairmen were "injured while doing said work, but not in a reasonably competent, safe, skillful, or workmanlike manner." Complaint ¶ 5. Plaintiff states that the total amount for which it claims, $375,000, constitutes amounts "paid and incurred as a result in whole or in part of defendant's negligence, breach of contract, and/or breach of warranties to plaintiff." *Id.* at ¶ 11.

In opposition to defendant's motion, plaintiff argues that the accident occurred beyond "the navigable waters of the United States" within the meaning of the LHWCA so that the act does not apply. Plaintiff additionally argues that defendant's liability to the workers was under the New York Workmen's Compensation Law and that such state law does not shield the employer from liability to the plaintiff shipowner.[4]

This case thus presents a question of statutory interpretation: whether the situs of injury, the high seas, precludes LHWCA coverage. This is the only respect in which LHWCA coverage is put in dispute. The parties are in agreement that apart from the injury situs question, the accident here falls within the purview of the LHWCA.[5]

Counsel have informed us that this is a cast of first impression, and indeed we find no federal court to have analyzed the question of LHWCA coverage of the high seas.[6] *Cf. Szumski v. Dale Boat Yards, Inc.,* 90 N.J.Super. 86, 216 A.2d 256 (Super.Ct.App. Div.1966) (LHWCA covers injury on the high seas, in the Atlantic Ocean) *rev'd on other grounds,* 48 N.J. 401, 226 A.2d 11, *cert. denied,* 387 U.S. 944, 87 S.Ct. 2077, 18 L.Ed.2d 1331 (1967). In contrast, the landward extent of the act's coverage has been much litigated and analyzed. It is the recently expanded practice of sending repairmen to sea with a vessel in order for the ship to avoid costly time laid up in port which brings this question before us. This practice assures that although other federal courts have not had to face the high seas issue in the fifty-four years since the 1927

2. Plaintiff alleges that, "[a]lthough duly demanded, defendant refused to defend said suit or contribute to or indemnify plaintiff for the amount of said settlements and expenses or any part thereof." Complaint at ¶ 9. Defendant alleges that, "[p]laintiff, without notice to or contribution from defendant, elected to settle the claims of Messrs. Georgopoulos and Roussos." Burke Affidavit at ¶ 4(e).

3. The Complaint at ¶ 1 states that, "[p]laintiff's claims herein against defendant are admiralty or maritime claims within the meaning of F.R. C.P. 9(h)."

4. Plaintiff also argues that, "defendant does not even assert, let alone prove, that it or its carrier paid any Act compensation." Plaintiff's Memorandum (unpaginated) at fifth page. However, in Burke Reply Affidavit ¶ 3 and accompanying papers, defendant has so asserted, and thus mooted this point.

5. Since the question of whether LHWCA coverage includes the high seas is purely a question of law, we do not address the activity of the Benefits Review Board regarding injury on the high seas. *See* 4 Larson's Law of Workmen's Compensation 16—224 n.27.

6. There has been some consideration of LHWCA coverage beyond the high seas, in what the courts have found to be the territorial waters of other jurisdictions. *See Panama Agencies Co. v. Franco,* 111 F.2d 263, 265 (5th Cir. 1940); *Christianson v. Western Pacific Packing Co.,* 24 F.Supp. 437, 439 (W.D.Wash. 1938). There also has been more extended consideration of whether the act applies in Puerto Rican waters. *See Garcia v. Friesecke,* 597 F.2d 284, 293 (1st Cir.), *cert. denied,* 444 U.S. 940, 100 S.Ct. 292, 62 L.Ed.2d 306 (1979) (LHWCA does not apply to Puerto Rico). On the application of the act beyond the high seas, in the territorial waters of other jurisdictions, see p. 109 *infra.*

enactment of the LHWCA, the question will arise again.

The LHWCA as originally enacted set up a workmen's compensation system covering longshoremen and including ship repairmen, injured or killed in the course of their work. However, among the conditions of coverage set forth in the act was a condition respecting the situs of injury:

(a) Compensation shall be payable under this Act in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) . . . .

Sec. 3.

The 1927 act included two other provisions relevant to its geographical coverage. In its "Definitions" section, it stated: "The term 'United States' when used in a geographical sense means the several States and Territories and the District of Columbia, including the territorial waters thereof." Sec. 2(9). Lastly, in the "Administration" section of the act, it was provided that:

(b) The commission shall establish compensation districts, to include the high seas and the areas within the United States to which this Act applies, and shall assign to each such district one or more deputy commissioners, as the commission deems advisable. Judicial proceedings under sections 18 and 21 of this Act in respect of any injury or death occurring on the high seas shall be instituted in the district court within whose territorial jurisdiction is located the office of the deputy commissioner having jurisdiction in respect of such injury or death (or in the Supreme Court of the District of Columbia if such office is located in such District).

Sec. 39.

In 1972, Congress enacted substantive revisions to the LHWCA, including a change in the first of these three provisions. The other two remained unchanged. The change made in Sec. 3(a) added language so that it now reads in relevant part:

(a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

In other words, LHWCA coverage was extended landward. *Cf. Sea-Land Service, Inc. v. Director, Office of Workers' Compensation Programs, United States Dept. of Labor*, 540 F.2d 629, 638 (3d Cir. 1976) (considered below, and finding that the 1972 amendments transformed the act's situs requirement into a "functional" requirement).

The question we are faced with, then, is whether "the navigable waters of the United States" within the meaning of the LHWCA include a point 135 miles off the coast of the continental United States. Because, at the time of both the 1927 act and the 1972 amendments, waters 135 miles off the United States coast were considered the high seas, as distinguished from the territorial waters of the United States, which extend approximately three miles seaward from the coast, *see* n.1 *supra* and cases cited therein; *Moragne v. States Marine Lines*, 398 U.S. 375, 397–98, 90 S.Ct. 1772, 1785–86, 26 L.Ed.2d 339 (1970), *on remand*, 446 F.2d 909 (5th Cir. 1971),[7] the question can be more generally stated to be whether "the navigable waters of the United States" within the meaning of the LHWCA include the high seas.

Since we conclude that the high seas are included in LHWCA coverage, we need not consider the argument advanced by defendant, which finds some support in *Sea-Land*,

---

**7.** 1 Benedict on Admiralty at 9—2 states that in the early days of the United States "high seas" included coastal waters. As reflected in text *infra*, the authorities indicate the understanding was otherwise by the time the LHWCA was passed. Even if the earlier understanding persisted to any extent in 1927, it would not effect the reasoning or outcome herein.

that the act's situs coverage provisions are not literal geographical location requirements, but rather are "functional" requirements, see 540 F.2d at 638. The "functional" interpretation of the act's situs requirement is an interpretation which extends the geographical limits of the ·act's coverage beyond the boundaries of coverage which result from a literal geographical reading of the situs requirement. The literal geographical approach to the situs requirement finds support in *Crowell v. Benson*, 285 U.S. 22, 55, 52 S.Ct. 285, 294, 76 L.Ed. 598 (1932), where the Court stated:

> Unless the injuries to which the Act relates occur upon the navigable waters of the United States, they fall outside [the constitutional limits which are inherent in the admiralty and maritime jurisdiction] . . . . [T]he locality of the injury, that is, whether it has occurred upon the navigable waters of the United States, determines the existence of the congressional power to create the liability prescribed by the statute.

(Footnotes omitted.)

*See also Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 264–65, 279, 97 S.Ct. 2348, 2357, 2365, 53 L.Ed.2d 320 (1977). It is this more restrictive and literal reading of the situs requirement we apply here. Since we find the high seas covered under such a reading, we need not consider the validity of the alternative, more geographically inclusive interpretation of the situs requirement.

Turning to the task of interpreting the coverage of "the navigable waters of the United States," we note that just as it is, as we have already noted, the landward rather than the seaward extent of the LHWCA which has received the benefit of judicial analysis, so it is that the phrase "the navigable waters of the United States" as it appears in numerous statutes and in caselaw has been considered mostly in the context of determining its inland reach rather

than its seaward extent. The plethora of materials on "the navigable waters of the United States" overwhelmingly concern whether a certain river, lake or pond in the continental United States is a "navigable water of the United States" as opposed to being waters within the jurisdiction of a state.

■ "The navigable waters of the United States" is a catch phrase which has been used in many statutes, see 1 Benedict on Admiralty 9—46–47 (7th ed. & Supp.1980), and regulations, and in caselaw since before the enactment of the LHWCA. However, the Supreme Court has recently made it clear that the meaning of the phrase is not a fixed one which "remains unchanged in whatever context it is being applied," *Kaiser Aetna v. United States*, 444 U.S. 164, 170–71, 100 S.Ct. 383, 387–88, 62 L.Ed.2d 332 (1979) (distinguishing congressional authority to regulate navigation from "navigational servitude"), and the meaning of the phrase has been noted to vary according to whether it is Congress' commerce power or admiralty jurisdiction which is being exercised in the act in question, see Guinn, *An Analysis of the Navigable Waters of the United States*, 18 Baylor L.Rev. 551 (1966). However, which power Congress is exercising may be critical in determining whether certain inland waters are "navigable waters of the United States," but not when determining whether the high seas are included. Under both the admiralty jurisdiction and the commerce clause, the high seas are part of "the navigable waters of the United States." *See, e. g., The Plymouth*, 70 U.S. (3 Wall.) 20, 33, 18 L.Ed. 125 (1865); *The Eagle*, 75 U.S. (8 Wall.) 15, 20–21, 19 L.Ed. 365 (1868); *Ex parte Easton*, 95 U.S. 68, 72, 24 L.Ed. 373 (1877); *Atlantic Transport Co. v. Imbrovek*, 234 U.S. 52, 59 (1914); *In re Builders Supply Co.*, 278 F.Supp. 254, 256 (N.D.Iowa 1968); *United States v. City of Asbury Park*, 340 F.Supp. 555, 562 (D.N.J. 1972).[8]

---

**8.** The classic definition of "navigable waters of the United States" is:

> Those rivers must be regarded as public navigable rivers in law which are navigable in

fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel

■ In point of fact, the LHWCA was intended by Congress as an exercise of power under the admiralty and maritime jurisdiction. *See, e.g., To Provide Compensation for Employees Injured and Dependents of Employees Killed in Certain Maritime Employments: Hearing on H.R. 9498 Before the House Comm. on the Judiciary*, 69th Cong., 1st Sess. at 47 (1926) (remark of The Chairman). "[I]t should be said at once that the 'three-mile limit' has nothing to do with admiralty jurisdiction, which subsists as well within it as without it." G. Gilmore & C. Black, The Law of Admiralty 31 (2d ed. 1975).

Furthermore, we note that lest the words "of the United States" be assumed to restrict "the navigable waters of the United States" to United States territorial waters, the dissent in a footnote in *Kaiser*, making a point about the meaning of those words not disputed by the majority and dissent, wrote:

[W]e quickly may cast aside any distinction based on the qualifying phrase "of the United States." As prior cases demonstrate, this phrase is intended to draw the line between waters that may be navigated only intrastate, and those that are subject to navigation in inter-

state and foreign commerce. See, *e.g., United States v. Utah*, 283 U.S. 64, 75 [51 S.Ct. 438, 440, 75 L.Ed. 844] (1931); *The Daniel Ball*, 10 Wall. 557, 563 [19 L.Ed. 999] (1871). Since Kuapa Pond opens onto a bay of the Pacific Ocean, there can be no doubt that it may be navigated in interstate and foreign commerce.

444 U.S. at 184 n.4, 100 S.Ct. at 395 n.4 (Blackmun, J., dissenting).

■ Therefore, the phrase "the navigable waters of the United States" should be construed to have its ordinary meaning and to include the high seas, unless Congress, in a given act, restricts its meaning. 1 Benedict 9—46–47 (7th ed. 1974 & Supp.1980) states:

Much of the maritime legislation enacted since 1910 applies to all the navigable waters of the United States without distinction—to the high seas, the coastal waters and sounds and bays, the Great Lakes, the inland rivers and lakes. [Citing, *inter alia*, the LHWCA.] If an exclusion is intended, it is usual to express it.

(Footnotes omitted.) [9]

We turn, then, to the language of the LHWCA. The "Coverage" section of the

---

are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water. *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871). *See also The Montello*, 78 U.S. (11 Wall.) 411, 415, 20 L.Ed. 191 (1871). Although *The Daniel Ball* focused on the status of inland waters, its definition would appear to embrace the high seas, since "they form . . . a continued highway over which commerce is or may be carried on with other States or foreign countries."

However, we also note that this definition by its terms would embrace some waters belonging to foreign countries. The case before us concerns only LHWCA coverage of the high seas and does not present the question of coverage in foreign countries. On that question, see p. 109 *infra*.

9. Plaintiff has referred the Court to Millus & Manes, The Longshoremen's and Harbor Worker's Compensation Act and Its Extensions, 77–80 (1978), which argues that the act does not cover the high seas:

Navigable waters and high seas had two distinct meanings at the time the Longshoremen's and Harbor Workers' Compensation Act was passed. Under admiralty law there were two distinct bodies of water, i.e. the high seas and navigable waters.

. . . .

The three mile limit is significant in determining where navigable waters end and the high seas begin. Under the Submerged Lands Act "lands beneath navigable waters" means lands extending three geographical miles distant from the coastline of each state. No case under the Longshoremen's and Harbor Workers' Compensation Act has been found where the court had to draw a sharp line between the point where "navigable waters" ended and "high seas" began. If the Court had to make such a determination in a Longshoremen's and Harbor Workers' Compensation Act case it would probably draw the line at a point three geographical miles distant from the coastline.

act suggests no restriction in the meaning of "the navigable waters of the United States." The "Administration" section of the act provides strong indication that the high seas are included in the act's coverage, since the section directs the formation of compensation districts "to include the high seas," and makes provision for judicial proceedings concerning injury on the high seas. Plaintiff attempts to detract from the impact of this section by pointing out that other acts of Congress have incorporated the administration provisions of the LHWCA, suggesting that the inclusion of the high seas may be a function not of LHWCA coverage but of the coverage of those other acts. However, the acts to which plaintiff refers us date from no earlier than 1941, while the LHWCA, including its "Administration" provision embracing the high seas, dates from 1927, as we have noted. The lapse of time between the enactment of the LHWCA and the enactment of these acts, together with the fact that the language of the LHWCA itself and its legislative history[10] provide no indication that the "Administration" section of the act was written in order to serve as a means of administration for other acts, leads us to reject plaintiff's argument on this point. We do note that in 1928, the District of Columbia adopted the LHWCA as its local workman's compensation system. However, we find nothing in the LHWCA language or legislative history to indicate that this was a consideration or shaped in any way the language of the "Administration" provision. We certainly find no indication that the provisions concerning the high seas were included for the purposes of some act other than the LHWCA. Therefore, the provisions must be construed as an indication that the LHWCA was intended to cover the high seas.

Congress, both before and after passage of the Longshoremen's and Harbor Workers' Compensation Act, recognized that "high seas" and "navigable waters" were not synonymous and were not to be used interchangeably.
(Footnotes omitted.)
"High seas" and "navigable waters of the United States" are not synonymous, because the latter is the more comprehensive term, embracing the former, as the authorities we have cited in text *infra*, demonstrate. We cannot agree with these writers that the two terms have or had in 1927 meanings which rendered the two bodies of water mutually exclusive and divided by the three mile limit. Nor do the authorities cited by these authors stand for such a proposition. *See* Millus & Manes at n.333, *citing Waring v. Clarke*, 46 U.S. (5 How.) 441, 12 L.Ed. 226 (1847); *Insurance Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1870). While we agree that the high seas, at least as currently understood, start at the three mile limit, we cannot agree that "the navigable waters of the United States" end there. Furthermore, we do not find the statutory definition of "lands beneath navigable waters" for the purposes of the Submerged Lands Act, to be indicative of the usual meaning of the phrase "the navigable waters of the United States" or its meaning in the LHWCA.
We note that Larson also has argued that the LHWCA extends only to the three mile limit, with logic equally unpersuasive. He adds to the Millus and Manes argument the claim that a congressional intent to so limit the act
    is indicated by the fact that, when Congress wanted to cover injuries sustained in oil drill-
ing operations beyond the territorial waters of the United States, it felt it necessary to pass a separate act, the Outer Continental Shelf Act [43 U.S.C. § 1933(c)], applying the provisions of the Longshoremen's Act to such injuries.
4 Larson's Workmen's Compensation Law 16—189 (footnote omitted). However, the Outer Continental Shelf Act concerns natural resources exploration, development, removal and transportation operations, and the workers involved therein. It is not a reiteration of LHWCA coverage as to a new geographical area.

10. The legislative history of the LHWCA as enacted in 1927 consists of the following: *Compensation for Employees in Certain Maritime Employments: Hearings on S.3170 Before a Subcomm. of the Senate Comm. on the Judiciary*, 69th Cong., 1st Sess. (1926); *To Provide Compensation for Employees Injured and Dependents of Employees Killed in Certain Maritime Employments: Hearing on H.R. 9498 Before the House Comm. on the Judiciary*, 69th Cong., 1st Sess. (1926); H.R.Rep. No. 1190, To accompany H.R. 12063, 69th Cong., 1st Sess. (1926); S.Rep. No. 973, 69th Cong., 1st Sess. (1926); 67 Cong.Rec. 10608-14 (1926); *To Provide Compensation for Employees Injured and Dependents of Employees Killed in Certain Maritime Employments: Hearing on S.3170 Before the House Comm. on the Judiciary*, 69th Cong., 1st Sess. (1926); H.R.Rep. No. 1767, 69th Cong., 2d Sess. (1927); 68 Cong.Rec. 5402 14 (1927); 68 Cong.Rec. 5900–09 (1927).

Having found the language of the "Coverage" and "Administration" sections of the LHWCA to indicate coverage of the high seas, we turn our attention to the language of the third relevant provision, the "Definitions" section, stating that, "The term 'United States' when used in a geographical sense means the several States and Territories and the District of Columbia, including the territorial waters thereof." 33 U.S.C. § 902(9). Plaintiff argues that this definition provision operates to limit LHWCA coverage to United States territorial waters. However, we do not read the language of the act this way. The definition provision contains no explicit statement that it modifies "the navigable waters of the United States" as found in the "Coverage" provision, and as we have discussed above, there is a long history of the use of the phrase "the navigable waters of the United States" as an integral unit, a catch phrase in which, as Justice Blackmun explained in the *Kaiser* dissent, the words "United States" do not have their usual independent meaning, but rather express a distinction "between waters that may be navigated only intrastate, and those that are subject to navigation in interstate and foreign commerce," 444 U.S. at 184 n.4, 100 S.Ct. at 395 n.4 (Blackmun, J., dissenting) (citations omitted). The words "United States" in the phrase "navigable waters of the United States" thus designate the waters as to which the United States rather than individual states have jurisdiction.

At the same time, the courts have found LHWCA coverage not to extend into the navigable waters of other countries and jurisdictions, *see* cases cited at n.6 *supra*. However, the case before us concerns injury which occurred 135 miles off the United States coast in the high seas, so that we are not faced with that issue here. The "Definitions" section defining "United States" has been relied upon as a basis for distinguishing those jurisdictions which are not part of the United States for the purposes of the LHWCA, so that their own territorial waters are not part of the "navigable waters of the United States." Thus, the court in *Panama Agencies v. Franco*, 111 F.2d 263, 265 (5th Cir. 1940) stated that,

by Sec. 3, 33 U.S.C.A. § 903, the Longshoremen's Act applies only where injury occurs "upon the navigable waters of the United States", and by the preceding section the United States means the several States and Territories and the District of Columbia; so it does not apply in the Canal Zone.

This reasoning was apparently adopted by the Second Circuit in *Mahramas v. American Export Isbrandtsen Lines, Inc.*, 475 F.2d 165, 169 n.3 (2d Cir. 1973), where the court stated,

The Compensation Act is the exclusive remedy for an employee, not a member of the crew of a vessel, against his employer when an injury occurs "upon the navigable waters of the United States," 33 U.S.C. §§ 902(4), 903(a). Because the injury in this case did not arise upon the navigable waters *of the United States*, the Act clearly does not apply to this plaintiff, see, *Panama Agencies Co. v. Franco*, 111 F.2d 263, 265 (5th Cir. 1940).

The opinion does not make clear the precise location of the vessel when the injury occurred, but the court's citation of *Panama Agencies* suggests that the location was the waters belonging to another sovereign.

Our interpretation of the LHWCA is in harmony with *Panama Agencies* and *Mahramas*. We conclude that "the navigable waters of the United States" within the meaning of the LHWCA embrace the high seas. At the same time, under the reasoning of *Panama Agencies*, "the navigable waters of the United States" for the purposes of the LHWCA do not extend into the waters belonging to jurisdictions which under the LHWCA "Definitions" section are jurisdictions which are not a part of the United States.

Thus far we have considered the language of the act. We turn now to its legislative history, cited in full at n.10 *supra*. Nowhere in the legislative history is the seaward extent of the act explained. However, the relevant provisions of the act, that is, the "Definitions," "Coverage," and

"Administration" sections, went through several revisions. We conclude that while the legislative history does not explain the effect of the successive revisions on the seaward extent of the act, the evolution of these sections indicates a congressional intent to cover the high seas in the final version of the LHWCA.

The evolution of the "Administration" provision of the act provides the clearest indication of the act's coverage with respect to the high seas. As we have already noted, the "Administration" section as it now stands, and as it was finally enacted in the original act, provides for the establishment of "compensation districts, to include the high seas and the areas within the United States to which this chapter applies." The original bill in the Senate did not so specify. The bill simply provided for the establishment of "compensation districts, including places where work covered by this act is done." While this language does not specify the high seas, it evidently included them, since the "Coverage" section of the bill stated that, "[t]his act shall apply to any employment performed on a place within the admiralty jurisdiction of the United States...," and the admiralty jurisdiction embraces the high seas. In any case, the specification of the high seas in the "Administration" section was introduced by the Senate, which changed the "Administration" section to its current wording, inserting also the provision concerning judicial proceedings "in respect of injury ... on the high seas." At the same time that the Senate made this change, it made other changes in the bill's wording which made its coverage of the high seas clear. The Senate changed the "Coverage" section to require "an injury occurring upon the navigable waters of the United States ... or occurring while such employee was employed on board a vessel of the United States upon the high seas."[11] The relevant part of the "Administration" section, with its explicit inclusion of the high seas, hence-forth remained unchanged, while the "Coverage" section went through two further permutations. The House introduced changes, in what turned out to be the single abortive attempt to include in the LHWCA a vessel's master and crew members, so that the "Coverage" section in relevant part stated:

This act shall apply to any maritime employment performed—

(a) Upon the navigable waters of the United States...; or

(b) As master or member of a crew of a ... vessel, or other ocean, lake, river, canal, harbor, or floating craft owned by a citizen of the United States.

*Provided, however,* That this act shall not apply to (1) employment as master or member of the crew of a foreign vessel....

Definitions of "employer" and "employee" which were in keeping with this coverage were also inserted. Finally, the House and Senate each accepted amendments to the language of the "Coverage" section altering it to its present form, namely, with master and crew members not included and covering "injury occurring upon the navigable waters of the United States."

The fact that the "Administration" section continues to provide for inclusion of the high seas through the final form of the act indicates that the act's coverage includes the high seas. The "Administration" section's specification of the high seas appears to have been entirely deliberate, an alteration of the original language of the bill in coordination with complementary language changes in other sections. Had Congress intended ultimately to eliminate coverage of the high seas, it could have so altered the language of the "Administration" provision. Moreover, the fact that this specification first appears in coordination with the specification of the high seas in complementary portions of the act, pro-

---

11. In keeping with this change, the Senate inserted a definition of "employer," which stated that "[t]he term 'employer' means an employer any of whose employees are employed in whole or in part upon the navigable waters of the United States..., or on board a vessel of the United States upon the high seas."

vides further indication [12] that the inclusion of the high seas in the "Administration" section is for the purpose of the LHWCA itself and not instead for the purpose of administering other acts. The "Administration" section's inclusion of the high seas therefore must be taken as a manifestation of congressional intent to cover the high seas.

The evolution of the "Coverage" section itself is in harmony with this. When the Senate altered the "Coverage" section so as to specify coverage of the high seas and additionally to state coverage of navigable waters of the United States, it was by way of attaching a special condition in the event of injury on the high seas. The Senate language stated that injury must be on a United States vessel while on the high seas. The conjunction placed between the language covering the navigable waters of the United States and that covering injury while on board a vessel of the United States on the high seas was "or," raising the possibility that the two conditions were considered mutually exclusive. However, it is also possible that the former phrase, "navigable waters," stated general coverage of injuries on navigable waters including the high seas, while the latter phrase imposed a more specific condition to apply to the subset of injuries occurring on the high seas. The matter is ambiguous. In the House version of the "Coverage" section it is clear that the two conditions of coverage linked by the word "or" are not mutually exclusive. The former phrase states coverage of maritime employment performed "upon the navigable waters of the United States," whereas the latter phrase continues, "or as master or member of a crew of a . . . vessel . . . owned by a citizen of the United States." Since masters and crew members may also be found "upon the navigable waters of the United States," however narrowly such waters are defined, the two conditions cannot be mutually exclusive. Yet here again there is ambiguity: the section is open both to interpretation according to which "the navigable waters of the United States" includes the high seas and the latter phrase simply imposes conditions on and specifies a subset of cases covered, as well as to interpretation according to which "the navigable waters of the United States" does not include the high seas so that on the high seas only those who can qualify for the second coverage condition, namely crew masters and members, are covered.

Faced with this ambiguity, we have certain principles to guide us. One is that "the navigable waters of the United States" should be given its ordinary meaning unless expressly limited in the act. *Cf. Asbury Park*, 340 F.Supp. at 562 (stating that "the Atlantic Ocean is a navigable water of the United States within the meaning of the Rivers and Harbors Appropriation Act of 1899," and that "[c]learly, it would seem any statute which attempts to regulate the navigable waters of the United States must—unless limited in some specific fashion—include all of the waters of the United States."); 1 Benedict at 9—46–47 (as quoted at p. 107 *supra*). Since the ordinary meaning of the phrase when not limited includes the high seas, and the versions of the LHWCA we are reviewing do not clearly limit the phrase's meaning, this principle favors those interpretations of these two versions of the act according to which "the navigable waters of the United States" includes the high seas. More importantly, the final version of the act, the version that was enacted, eliminated all of the material which in the two versions of the act we have been reviewing followed the "or". Congress eliminated special conditions of coverage under which crew masters and members were covered. Congress also eliminated from the "Coverage" provision any special conditions of coverage concerning the nationality of the ship. What was left was coverage of injury "upon the navigable waters of the United States." There is no reason to assume that in the process of deleting these special conditions of coverage from the language of the "Coverage" section, Congress was eliminating high seas coverage for the workers who remained

---

12.  See discussion at pp. 107–108 *supra*.

within the act. In fact, such an assumption would render the "Administration" section's express inclusion of the high seas mere surplusage. Therefore, we conclude that the phrase, "the navigable waters of the United States" retained its ordinary meaning, and within the meaning of the LHWCA includes the high seas.

■ When Congress enacted the LHWCA, it was taking action to protect and compensate a class of workers whom it recognized to have particularly hazardous occupations, and to be one of the few remaining categories of workers still not covered by a workmen's compensation system. The legislation was remedial, and the courts accordingly have articulated a presumption in favor of LHWCA coverage. If any ambiguity exists it should be resolved in favor of coverage.

■ Prior to the enactment of the LHWCA in 1927, Congress had made other legislative attempts to provide workmen's compensation for these workers. However, Congress had attempted to do this by way of the extension of state workmen's compensation seaward, and the Supreme Court had ruled this unconstitutional, holding that the Constitution forbade this delegation by Congress of its power to legislate within the admiralty and maritime jurisdiction. *See Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715, 717–18, 100 S.Ct. 2432, 2434–35, 65 L.Ed.2d 458 (1980). In enacting the LHWCA, Congress was curing the situation resulting from these Supreme Court decisions which limited the seaward extent of the state acts and struck down Congress' attempt to cover these workers beyond that line. The thrust of the legislative history of the LHWCA is to cover these workers to the extent necessary to provide workmen's compensation for them where the states cannot. We find no reason to conclude at this late date that Congress in filing this

void meant to leave these same workers uncovered in yet another portion of the admiralty and maritime jurisdiction, the high seas. Moreover, the Supreme Court has recently reaffirmed, albeit in a case concerning land-based injury, that with the enactment of the LHWCA, "[f]ederal and state law were thus linked together to provide theoretically *complete* coverage for maritime laborers." *Sun Ship*, 447 U.S. at 718, 100 S.Ct. at 2435 (emphasis added).

There is no contention before us that the physical character of the high seas is such that a different rule of workmen's compensation should apply there than applies in coastal waters. Plaintiff offers and we perceive no reason other than abstract theory and inapt analogy why the carefully balanced economic relations and distribution of risk among the longshoremen, their employers, and the shipowners, which was originally set forth in the LHWCA and subsequently readjusted by amendment to the act, should stop three miles offshore and another regime pertain beyond.[13] Moreover, in this case the ship was in high seas only because of an unscheduled deviation in the ship's itinerary for testing purposes. There is no reason to draw a line leaving the LHWCA workers uncovered for the part of the voyage which was on high seas.

Inasmuch as we find that the location of the accident in this case satisfies the situs requirement of the LHWCA, and that the LHWCA accordingly applies, plaintiff's action for its indemnification as shipowner by the defendant employer cannot stand. In the 1972 amendments to the act, Congress abolished indemnification actions by the shipowner against the employer. 33 U.S.C. § 905(b). *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979); *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714 (2d Cir.

---

**13.** As we have had occasion elsewhere to note, *see Del Re v. Prudential Lines*, No. 80–2349, slip op. at 4-5 (S.D.N.Y. June 18, 1981), congressional reconsideration of features of the LHWCA has been reported to be imminent, *see* N. Y. Times, June 9, 1981, at A14. If Congress finds it necessary to address itself to the high seas coverage of the act, it may or may not find it desirable to make adjustments to the economic balance it has struck among the three key interests covered by the act, as to the specifics of high sea coverage.

1978). Section 905 shields the employer from this indemnification action.[14]

Plaintiff further claims that it retains an indemnification cause of action against the defendant employer under state workmen's compensation law.[15] This requires us to determine the limits of the applicability of state workmen's compensation coverage. One authority has addressed this question, and suggests that the answer may be that state coverage is now concurrent with federal coverage throughout the range of the latter. 4 Larson's Workmen's Compensation Law 16—262–72. However, it must be remembered that Larson concludes that LHWCA coverage does not include the high seas. *See* n.9 *supra*. If there is any viability at all left in *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) and its progeny, and the language of the Supreme Court's recent decision in *Sun Ship*, 447 U.S. at 719, 722, 100 S.Ct. at 2435, 2437, indicates that there is, then injury on the high seas, 135 miles offshore, and therefore well beyond state waters, must be beyond the outer limit of state coverage. We therefore find LHWCA coverage to be exclusive in this case. Consequently, plaintiff cannot resort to a cause of action under the state workmen's compensation law.

Since we have decided that the federal act applies exclusively in this case, and since that act forbids this indemnification action, plaintiff cannot maintain it. Defendant's motion is granted.

SO ORDERED.

**14.** Although it appears that the Georgopoulos settlement occurred before any litigation had ensued, and the Roussos settlement terminated a suit styled under general maritime law and the Jones Act, the parties have not based any arguments on this, and specifically no arguments concerning the applicability of § 905. Plaintiff makes an isolated statement, unelaborated, which might be construed as related to this: "Referring only to the negligence allegation in Roussos' amended complaint, defendant erroneously assumes that possible negligence liability was the only risk which induced the settlements, thus ignoring the risk stemming from the unseaworthiness allegations in paragraphs 5 and 6 of the amended complaint." Plaintiff's Memorandum In Opposition (unpaginated) at fifth page. However, on the papers before us we cannot regard the parties as having put in issue the applicability of § 905 on the basis of the character or disposition of the employees' claims against the shipowner.

**15.** Plaintiff merely asserts the applicability of state workmen's compensation law without any reasoning, and cites in support New York state cases which do not concern the LHWCA or admiralty and maritime matters. *See* Plaintiff's Memorandum in Opposition (unpaginated) at fifth page.