ISLA NENA AIR SERVICES, INC., a Puerto Rico corporation, and San Juan Jet Charter, Inc., a Puerto Rico corporation, Plaintiffs,

v.

CESSNA AIRCRAFT COMPANY, et al., Defendants.

No. CIV.04–1883(RLA).

United States District Court, D. Puerto Rico.

Aug. 9, 2005.

---

5.  2005 WL 1761591

Juan A. López–Conway, Garcia & Fernandez, San Juan, PR, Lawrence D. Goodman, Robert J. Kuntz, Jr., Devine, Goodman, etc., Miami, FL, for Plaintiffs.

James M. Derr, St. Thomas, VI, Bruce J. McGiverin, San Juan, PR, David A. Wagner, J. Thompson Thornton, Thornton, Davis & Fein PA, Miami, FL, for Defendants.

## *OPINION AND ORDER*

ACOSTA, District Judge.

### *INTRODUCTION*

This case arises from an incident on August 30, 2003, when a single engine aircraft suffered engine failure and made an emergency landing in the water close to a beach in Culebra, Puerto Rico. The owner of the aircraft, plaintiff ISLA NENA AIR SERVICES, INC. (ISLA NENA) and its successor in interest, plaintiff SAN JUAN JET CHARTER, INC., sued the manufacturers of the aircraft and engine, defendants CESSNA AIRCRAFT COMPANY (CESSNA) and PRATT & WHITNEY CANADA CORP. (PRATT), respectively.

Invoking this Court's diversity jurisdiction, plaintiffs seek recovery based on theories of negligence and strict products liability arising from Article 1802 of Puerto Rico's Civil Code, 31 L.P.R.A. § 5141, for costs associated with the loss of the aircraft, repair to the aircraft, loss of business income for the time the aircraft has been out of service, and other related damages. *See* Complaint, Counts I through IV. Plaintiffs also seek indemnification for any amounts they may be adjudged to pay in claims brought by the aircraft's passengers. *See* Complaint, Counts V and VI.

Before the Court is defendants' motion to dismiss Counts I through IV pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and plaintiffs' opposition thereto. Defendants argue that regardless of the jurisdictional basis asserted in the complaint, this Court is bound to apply admiralty law to plaintiffs' alleged claims, which law adopts the "economic loss rule", precluding recovery for damage to the air-

craft or any of its component parts, except under warranty claims. *See East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Alternatively, defendants argue that Puerto Rico's substantive law would also follow the "economic loss" rule, and that plaintiffs' claims would be precluded even if admiralty does not apply. Plaintiffs, for their part, maintain that admiralty law does not govern this case and that their claims are cognizable under Puerto Rico's Civil Code. The parties have fully briefed their positions in several filings. *See* Docket Nos. 21, 22, 26, 32, 36, 48, 49, 52, 53.

For the reasons set out below, the Court GRANTS defendants' motion and consequently dismisses Counts I through IV of the Complaint.

### THE INCIDENT

It is axiomatic that for the purposes of deciding a motion to dismiss, the court must accept as true all allegations of the complaint, resolve all doubts and inferences in the plaintiff's favor, and view the pleading in the light most favorable to the non-moving party. *Albright v. Oliver*, 510 U.S. 266, 267, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). A claim will be dismissed under Rule 12(b)(6) only if it appears beyond doubt that the pleader can prove no set of facts in support of the claim that would entitle the pleader to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In this case, the following facts are alleged in the complaint or arise indisputably from the facts so alleged:

Plaintiff ISLA NENA is a short-haul commercial airline based in Puerto Rico. In 2001, ISLA NENA purchased a Model 208B Grand Caravan manufactured by CESSNA. The engine of the aircraft was a Model PT6A–114 engine manufactured by PRATT. On August 30, 2003, the aircraft was carrying nine passengers on a commercial revenue flight from Fajardo to Culebra. Fajardo is a city on the northeast coast of Puerto Rico, and Culebra is an island municipality of Puerto Rico approximately twenty miles east of Fajardo. While flying approximately five miles west of Culebra at an altitude of 2,500 feet, the pilot heard a loud noise and the engine lost power. He established a glide toward Flamenco Beach on Culebra and, according to the complaint, "performed a controlled emergency landing of the Aircraft *in the water near the shoreline of Flamenco Beach.*" The complaint further alleges that, following the emergency landing, the pilot "assisted all the passengers *to the shore* " and no one was injured (emphasis added). However, the aircraft suffered major damage to all of its components, and the engine was destroyed.

An investigation conducted by the National Transportation Safety Board concluded that the engine had suffered some type of damage that resulted in its failure. Plaintiffs allege that the damage was the result of defects in the rivets installed in the air intake by CESSNA, or by some other defects in the aircraft or one of its component parts for which defendants are liable. Plaintiffs seek various economic damages, including cost to repair the aircraft, loss of value of the aircraft, and lost profits from the operation of the aircraft.[1]

### DISCUSSION

#### A. Admiralty Jurisdiction

■ Since it is undisputed that this action involves the crash of a land-based

---

1. Plaintiffs also seek indemnity from potential claims that may be brought by the passengers on board the aircraft and their families. That cause of action is not the subject of the motion to dismiss.

aircraft into ocean waters during a flight between the mainland of Puerto Rico and an offshore island, the analysis must begin with *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). In that case the Supreme Court adopted a two-prong test for determining whether admiralty law applied to the crash of a land-based aircraft in the waters of Lake Erie: first, the *situs* of the crash had to be within navigable waters; and second, there had to be some *nexus* between the type of activity involved and traditional maritime activity. *Id.*

A trio of subsequent cases expanded upon these requirements: *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), and *Grubart v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). These cases initially concurred that a court must first determine whether the alleged tort occurred on navigable waters. They went on, however, to raise two issues under *Executive Jet*'s second prong: (1) whether the incident has a "potentially disruptive impact on maritime commerce" (viewing the "general features of the type of incident involved"); and (2) whether the "general character" of the "activity giving rise to the incident" bears a "substantial relationship to traditional maritime activity." *See, Sisson,* 497 U.S. at 363–65, 110 S.Ct. 2892.

### 1. The Navigable Waters Requirement

■ Applying these standards to the case at hand, there can be little doubt that the first prong of *Executive Jet* is met. The complaint contains repeated references to the fact that the aircraft came to rest "in the water near the shoreline of Flamenco Beach," and that the pilot subsequently helped the passengers "to the shore." The waters of the ocean surrounding Culebra are "navigable waters" insofar as Congress has specifically designated all the waters surrounding Puerto Rico and its islands as "navigable waters" for purposes of admiralty jurisdiction:

> "The harbor areas and navigable streams and bodies of water and submerged lands underlying the same in and around the island of Porto Rico [Puerto Rico] and the adjacent islands and waters, now owned by the United States and not reserved by the United States for public purposes, be, and the same are hereby, placed under the control of the government of Porto Rico [Puerto Rico], to be administered in the same manner and subject to the same limitations as the property enumerated in the preceding section [48 USCS §§ 747, 748]: *Provided,* That all laws of the United States for the protection and improvement of the navigable waters of the United States and the preservation of the interests of navigation and commerce, except so far as the same may be locally inapplicable, shall apply to said island and waters and to its adjacent islands and waters..."

48 U.S.C. § 749.

The text of the statute continues:

> "Notwithstanding any other provision of law, as used in this section... 'navigable bodies of water and submerged lands underlying the same in and around the island of Puerto Rico and the adjacent islands and waters' extend from the coastline of the island of Puerto Rico and the adjacent islands as heretofore or hereafter modified by accretion, erosion, or reliction, seaward to a distance of three marine leagues."

The result would be the same under a common law analysis. It has long been

the rule in the United States that all waters within the ebb and flow of the tide are considered navigable waters. In *In re Complaint of Paradise Holdings, Inc.*, 795 F.2d 756 (9th Cir.1986), the Ninth Circuit noted that "[t]hroughout the nation's history, tidal waters have been held to be within the definition of 'navigable waters.' Indeed, until 1851 admiralty jurisdiction was limited to waters 'within the ebb and flow of the tide.' *The Steamboat Thomas Jefferson*, 23 U.S. (10 Wheat.) 428, 6 L.Ed. 358 (1825)." *See also, Hassinger v. Tideland Electric Membership Corp.*, 781 F.2d 1022 (4th Cir.1986) ("Admiralty jurisdiction in America . . . extends to all areas within the ebb and flow of the tide, regardless of whether those areas are actually covered by water at the time of the alleged event" (quotes omitted)); *Cove Tankers Corp. v. United Ship Repair, Inc.*, 528 F.Supp. 101(S.D.N.Y.1981) (term "navigable waters of the United States" includes both the territorial waters within 3 nautical miles of a State as well as the high seas); *McCormick v. United States*, 680 F.2d 345 (5th Cir.1982) (admiralty jurisdiction runs from shoreline to shoreline; fact that a portion of a bay is not navigable is irrelevant); *United States v. Ray*, 423 F.2d 16, 19 n. 4 (5th Cir.1970) ("The fact that a portion of a body of water is non-navigable does not affect the legal character of general navigability of the area"); *United States v. Turner*, 175 F.2d 644, 647 (5th Cir.1949), *cert. denied*, 338 U.S. 831, 70 S.Ct. 92, 94 L.Ed. 521 (1949) (no distinction permitted between shallows and depths of navigable waters).

## 2. The Maritime Nexus Requirement

■ Plaintiffs argue that even if the first prong of *Executive Jet* is met, admiralty law should not apply because the accident had no actual effect on maritime commerce. Although this argument has some common-sense appeal, it is ultimately misplaced. In the first place, the Supreme Court has made clear that the test is a broad one and concerns "potential impact" and not actual impact on maritime commerce. In *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), two pleasure boats collided on the Amite River in Louisiana. The district court had found—and the Supreme Court assumed as true—that neither vessel was engaged in any type of commercial activity "even in the broadest admiralty sense," that no other instrumentality involved in the accident had "even a minor relationship to 'admiralty' or 'commerce'," and that the river where the collision occurred was seldom, if ever, used by commercial traffic. Nevertheless, in determining the collision could have a potential impact on maritime commerce, the Court imagined the effects of the same collision had it occurred in the mouth of the St. Lawrence Seaway. Subsequently, in *Sisson*, the Supreme Court reaffirmed its intention to apply the "potential impact on maritime commerce" test extremely broadly. *See* 497 U.S. at 363, 110 S.Ct. 2892 ("Indeed, we supported our finding of potential disruption [in *Foremost* ] with a description of the likely effects of a collision at the mouth of the St. Lawrence Seaway, *ibid.*, an area heavily traveled by commercial vessels, even though the place where the collision actually had occurred apparently was 'seldom', if ever, used for commercial traffic;"). *Sisson* itself involved a fire on board a vessel tied to a dock that had no commercial vessels in the vicinity. Nevertheless, the Court found a potential impact on maritime commerce because commercial vessels could have been tied to the dock and the fire could have spread to those hypothetical vessels. The *Sisson* Court further eschewed "the fact-specific jurisdictional inquiry urged on us by respondents" (and by plaintiffs in

the present case) in favor of a broad application of potential impact illustrated above. *Id.* at 365. Most importantly, the Court in *Sisson* considered the sinking of an aircraft in navigable waters to be a paradigm example of a potential impact on maritime commerce:

> Our approach here comports with the way in which we characterized the potential disruption of the types of incidents involved in *Executive Jet* and *Foremost.* This first aspect of the jurisdictional test was satisfied in *Executive Jet* because 'an aircraft sinking in the water could create a hazard for the navigation of commercial vessels in the vicinity.' *Foremost,* 457 U.S. at 675, n. 5, 102 S.Ct. 2654.

*Sisson,* 497 U.S. at 363, 110 S.Ct. 2892. Applying this broad test to the present case, the Court must conclude that the accident alleged in the complaint had a potential impact on maritime commerce.

We next turn to whether the activity giving rise to this incident—commercial transportation between Puerto Rico and its offlying islands—is a traditional maritime activity as delineated by the case law. Plaintiffs argue that this final prong of the inquiry must focus on the defendants' activity rather than the plaintiff's, and maintain that the manufacture of land-based aircraft and aircraft engines cannot be considered a traditional maritime activity. In addition, plaintiffs contend that the specific component part that allegedly failed (a rivet) must have been engaged in the traditional maritime activity for the prong to be satisfied. The Court will discuss each of these arguments in turn.

Initially, the Supreme Court in *Sisson* arguably left open the question of whether the inquiry into the nature of the activity giving rise to the incident must focus on the conduct of the defendants, or of the plaintiffs, or on the general nature of the activity itself. *Id.* at 365, note 3 ("[d]ifferent issues may be raised by a case in which one of the instrumentalities is engaged in a traditional maritime activity, but the other is not. Our resolution of such issues awaits a case that squarely raises them"). Nevertheless, virtually every court considering the issue post-*Sisson* has looked at the nature of the activity itself, rather than at the identity of the party engaged in the activity. *See, e.g. Brown v. Eurocopter,* 38 F.Supp.2d 515, 518 (S.D.Texas 1999) ("the use of helicopters to transport personnel to and from offshore drilling platforms is close enough in spirit to the use of boats to perform such tasks to show [a traditional maritime activity]"); *Kunkel v. Motor Sport Inc.,* 349 F.Supp.2d 198, 205 (D.P.R.2004) (because "this case involves the malfunction of a vessel on navigable waters, it falls within the courts of admiralty jurisdiction"); *Marshall v. Wellcraft Marine, Inc.,* 103 F.Supp.2d 1099, 1107 (S.D.Ind.1999) ("plaintiffs were clearly engaged in the quintessential maritime activity of using a waterway as a medium of transportation from one destination to another"). The clear majority rule at the present time is that it is the malfunctioning of the vessel or aircraft while operating in or over navigable waters that constitutes the traditional maritime activity, and not the identity of the particular party engaged in that activity at the time of the accident.

Furthermore, despite an initial conflict over the issue following *Executive Jet,* compare *American Home Assurance Co. v. United States,* 389 F.Supp. 657 (M.D.Pa. 1975) (crash of a land-based aircraft on a flight from the mainland of the United States to Block Island did not involve a traditional maritime activity), *with Hammill v. Olympic Airways, S.A.,* 398 F.Supp. 829 (D.D.C.1975) (crash of an aircraft while on a flight from the Island of

Corfu to mainland Greece involved traditional maritime activity),[2] today virtually every court considering the issue has found that aircraft crashes during overseas or inter-island flights involve a traditional maritime activity. *See, e.g., Preston v. Frantz*, 11 F.3d 357, 359 (2d Cir.1993) (helicopter crash between mainland and Nantucket Island "was engaged in a function traditionally performed by waterborne vessels: the ferrying of passengers from the mainland over the high seas to an island") (internal quotes omitted); *Miller v. United States*, 725 F.2d 1311, 1315 (11th Cir.1984)(admiralty jurisdiction applicable to action arising from crash in international waters of private plane transporting passengers from the Bahamas to Florida); *Roberts v. United States*, 498 F.2d 520 (9th Cir.1974), *cert. denied* 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974) ("the transoceanic transportation of cargo is an activity which is readily analogized with 'traditional maritime activity.' Indeed, before the advent of aviation, such shipping could only be performed by waterborne vessels"); *Ledoux v. Petroleum Helicopters, Inc.*, 609 F.2d 824 (5th Cir.1980)

(crash of a helicopter carrying workers to offshore drilling platform); *Mancuso v. Kimex, Inc.*, 484 F.Supp. 453 (S.D.Fla. 1980) (crash of aircraft on a flight from United States to Jamaica); *Higginbotham v. Mobil Oil Corp.*, 357 F.Supp. 1164 (W.D.La.1973), *aff'd in part*, 545 F.2d 422 (5th Cir.1977), *rev'd on other grounds*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978) (crash of a helicopter on a flight from mainland to offshore drilling rig); *Pagan v. United States*, 1982 U.S. Dist. LEXIS 10210 (D.P.R.1982).[3] As noted by one commentator summarizing the post-*Executive Jet* cases, "Maritime jurisdiction is properly invoked in aviation cases that involve (1) helicopter transport in oil rig operations, (2) cases involving a sea-plane that crashes in navigable waters, and (3) transoceanic or island voyages." James W. Huston & Bill O'Connor, *Admiralty Law and Jurisdiction in Air Crash Cases*, 69 J. Air. L. & Com. 299, 317 (2004).

Plaintiffs' argument that the defective component must itself be related to traditional maritime activity also lacks support.

**2.** In *Hammill* the Court noted:
"The airplane was on a flight across the Mediterranean Sea, from Corfu to Athens, and was serving a function that had traditionally been carried on by surface going maritime vessels. It can therefore be said, and this Court so finds, that the 'wrong' which befell plaintiff's decedent occurred as a result of an activity which bore a significant relationship to traditional maritime activity. That the actual crash happened to occur in Greek domestic waters, as opposed to the high seas or international waters, does not alter the fact that the rules of admiralty are uniquely appropriate for adjudicating what is in essence a maritime claim. The action is therefore subject to federal maritime jurisdiction and is cognizable under 28 U.S.C. § 1333 in a federal district court."

**3.** *Pagan* involved the crash of a land-based aircraft while on a flight from the United States to Puerto Rico. In holding that the

flight involved a traditional maritime activity, the court observed:

In the instant case, Dr. Pagan was flying from Florida to Puerto Rico, a flight primarily over water. Like the aforementioned cases, the airplane in this case was used for a function, that of transportation, which has traditionally been carried on by waterborne vessels. Before the advent of aircraft, the only form of transportation between the United States and Puerto Rico was by boat. In addition, the fact that the plane crashed in water was not merely fortuitous as was the case in *Executive Jet*. On a flight from Miami to San Juan, it is not fortuitous that a disabled plane would crash in navigable waters, but rather almost inevitable.

In this case, it is similarly inevitable that a disabled plane flying from Fajardo to Culebra would crash in navigable waters.

In *Sperry Rand ·Corp. v. Radio Corp. of America*, 618 F.2d 319 (5th Cir.1980), it was argued that admiralty jurisdiction could not attach unless the specific component part in question was manufactured exclusively for maritime use. In rejecting this argument the Fifth Circuit stated that "a finding of jurisdiction will best serve the purpose of admiralty jurisdiction to protect 'the... national interest in uniformity of law and remedies for those facing the hazards of waterborne transportation.'" *Id.*, at 322 (*citing Kelly v. Smith*, 485 F.2d 520, 526 (5th Cir.1973)). Other cases following *East River Steamship* have not required that a purportedly defective product be "specifically designed" for maritime use. In *Sisson*, the Supreme Court made no finding that the washer/dryer at issue was specifically designed for use at sea as a predicate for its finding that admiralty law applied. *Sisson, supra.* Similarly, in *Celebrity Cruises, Inc. v. Essef Corp.*, 101 F.Supp.2d 204, 209 (S.D.N.Y.2000), the court stated that the "maritime nexus requirement is met when a plaintiff alleges injury at sea resulting from a defective product, at least where that product is appurtenant to the vessel, even if it was not specifically designed for use at sea."

In summary, the Court finds that all the conditions for the exercise of admiralty jurisdiction under 28 U.S.C. § 1333 have been satisfied here and maritime law should apply.[4]

## B.  The Economic Loss Rule

■  The "economic loss" rule is a products liability concept that precludes tort claims, whether stated in negligence or strict liability, for damages the alleged defective product causes to the product itself resulting in purely economic losses under the rationale that such claims are properly brought as a warranty claim rather than in tort. Only where the alleged defective product causes damage to other property (other than the defective product itself) or personal injuries, does the economic loss rule not apply. In those exceptions, the plaintiff is entitled to recover in tort only those damages to the other property or for personal injuries sustained as a result, but not the economic losses associated with the alleged defective product. *See East River Steamship*, 476 U.S. at 874, 106 S.Ct. 2295; *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997).

In *East River Steamship*, the Court stated that "with admiralty jurisdiction comes the application of substantive admiralty law," and applied the economic loss rule to tort actions arising under admiralty jurisdiction. Thus, the Court held that in the admiralty context a manufacturer in a commercial relationship has no duty under either a negligence or a strict products liability theory to prevent a product from injuring itself. 476 U.S. at 864, 871, 106 S.Ct. 2295.

■  Applying the economic loss rule to this case must, per force, result in dismissal of Counts I through IV. This case involves the commercial sale of an aircraft to plaintiffs, who used it for commercial purposes. The complaint further alleges that

---

4.  If admiralty jurisdiction is available, substantive admiralty law will apply even if plaintiffs alleged diversity jurisdiction in the complaint. *See Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 410–411, 74 S.Ct. 202, 98 L.Ed. 143 (1953) (holding substantive admiralty law applies, though suit filed in federal court under diversity jurisdiction); *Preston v. Frantz*, 11 F.3d 357, 358–59 (2d Cir.1993) ("When, as in this case, plaintiffs bring a suit based upon diversity jurisdiction, we nevertheless apply substantive federal maritime law if we have admiralty jurisdiction"), *cert. dismissed* 512 U.S. 1279, 115 S.Ct. 31, 129 L.Ed.2d 928 (1994).

damage to the product (the aircraft) was caused by a defect in the product itself or in a component of the product (one or more allegedly defective rivets). Counts I through IV seek recovery for economic losses associated with the damage or loss of the aircraft, and not for damage to any other property or for personal injury resulting from the accident. Because these losses are properly the subject of warranty, and not of a tort arising under admiralty law, the holding of *East River Steamship* mandates their dismissal.

## C. Puerto Rico Law

Even if the Court accepts plaintiffs' argument that Puerto Rico law—and not general maritime principles—apply, the result would be the same, since the First Circuit has recognized the applicability of the economic loss rule in a commercial case arising under Puerto Rico law.

■ In *Betancourt v. W.D. Schock Corp.*, 907 F.2d 1251 (1st Cir.1990), the plaintiff sued a manufacturer for claimed defects in a sailboat. Rather than relying on admiralty law the plaintiff sued the manufacturer in contract and tort under Puerto Rico law. The district court dismissed the case, applying Puerto Rico's six-month limitations period for warranty actions. The Court of Appeals affirmed and in doing so rejected plaintiff's attempt to reconfigure what was a warranty case into a case arising under contract or tort. With respect to the contract claim, the First Circuit held that "Betancourt does not purport to rest his suit on the contract's express warranty and the Commonwealth Supreme Court has made clear that a party cannot avoid the statutory hidden-defect warranty's six-month limitation period simply by relabeling his action with the words 'breach of contract.'" *Id.* at 1254. The Court also rejected the plaintiff's attempt to cast his claim as one sounding in tort, stating that "we do not

see how he can assert a tort claim, however, for Puerto Rico's negligence statute, 31 L.P.R.A. § 5141, does not apply in the context of a commercial transaction." *Id.* at 1255; *see also, Stainless Steel & Metal Mfg. v. Sacal V.I., Inc.*, 452 F.Supp. 1073 (D.P.R.1978) (Section 5141 does not apply when source of obligation is contractual). The Court of Appeals further noted that plaintiff "cannot escape the 'warranty' statute by relabeling his action with the name 'tort' any more than by relabeling it 'contract.'" 907 F.2d at 1255. Immediately after making that statement, the Court of Appeals quoted with approval the following language from *East River Steamship:*

> "[A] manufacturer in a commercial relationship has no duty under either a negligence or a strict products-liability theory to prevent a product from injuring itself... Damage to a product itself is most naturally understood as a warranty claim... The maintenance of product value and quality is precisely the purpose of express and implied warranties."

*Id.* at 1255; *see also, Torres–Mas v. Carver Boat Corp.*, 233 F.Supp.2d 253 (D.P.R. 2002) (under Puerto Rico law, provision in Civil Code governing warranty for hidden defects, and not negligence and product liability standards, apply to case alleging defects in boat but not alleging personal injuries to plaintiff). Thus, this Court's previous cases applying Puerto Rico law have followed the rationale of the economic loss rule and limited a buyer to its remedies arising from the warranty accompanying a product for economic damage to the product itself. Finally, it is worth noting that a vast majority of jurisdictions have adopted the economic loss rule in similar contexts and have declined to apply tort or strict product liability when the loss is purely economic in nature. *See* Barkley Clark and Christopher Smith, *The Law of Product Warranties,* § 12.03[9][c] (1984). The Restatement of Torts also follows the

*East River* approach, limiting tort recovery to damage to the plaintiff's property other than the defective product itself, and the cases collected in the reporter's notes to that section indicate that only four states have declined to follow the holding of *East River* (Oregon, Tennessee, West Virginia, and Washington), whereas an overwhelming majority of forty-six states have adopted it. Restatement (Third) of Torts § 21(c) (1998). The Puerto Rico Supreme Court has recognized that Puerto Rico's law generally follows the principles of tort and strict product liability recognized by the Restatement. *See Malave–Felix v. Volvo Car Corp.*, 946 F.2d 967, 971 (1st Cir.1991), *citing Mendoza v. Cerveceria Corona, Inc.*, 97 P.R.R 487, 495–96, 1969 WL 21603 (1969). This Court has no doubt that Puerto Rico courts would recognize the economic loss rule as well.[5]

For the foregoing reasons, defendants' motions to dismiss (docket Nos. 21, 22) are **GRANTED** and Counts I through IV of the complaint are hereby DISMISSED.

Partial Judgment to issue.

IT IS SO ORDERED.

---

5. Plaintiffs have filed an extremely belated motion (docket No. 56) seeking to bring to the court's attention Article 3.03 of the Dock and Harbor Act, 23 L.P.R.A. § 2303(a), which purports to extend the reach of the Civil Code's negligence provisions to the navigable waters surrounding Puerto Rico. Plaintiffs had an opportunity to file an opposition to the pending Motion to Dismiss, and were granted leave to file a sur-reply to defendants' reply brief. The issues discussed herein were discussed in chambers during the Initial Scheduling Conference for several hours. Subsequent to that, all parties were given the opportunity to file supplemental briefs and to file one final document commenting on the other parties' brief. All briefing was complete on April 22, 2005. Plaintiffs have offered no excuse for the delay of nearly three months, and have failed to explain why, in the exercise or reasonable diligence, the information contained in the new motion could not have been brought to the court's attention previously. Therefore, I am denying any further briefing in this matter and as such, plaintiffs' Motion Requesting Leave to Supplement Issue of Applicable Law (docket No. 56) is **DENIED**. *See also,* Defendant's Joint Opposition... (docket No. 58) and Plaintiff's Motion Requesting Leave... (docket No. 59), which are **DENIED as MOOT**. In any event, for the reasons set forth in this opinion, the Court concludes that when the only damage claimed is to the product itself, the economic loss rule applies even if Puerto Rico law—and not admiralty law—governs this case.